Rod N. Andreason, Utah # 8853
  randreason@kmclaw.com
KIRTON | MCCONKIE
400 Kirton McConkie Building
50 East South Temple, Suite 400
P.O. Box 45120
Salt Lake City, UT  84145-0120
Telephone:  (801) 328-3600
Facsimile:  (801)321-4893

Bijan Amini, NY #1989052, *Admission Pro Hac Vice Pending*
Avery Samet, NY #4245965, *Admission Pro Hac Vice Pending*
STORCH, AMINI & MUNVES PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
Telephone: (212) 490-4100
Fax: (212) 490-4208
Email:  bamini@samlegal.com
          asamet@samlegal.com

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| MRS. FIELDS FRANCHISING, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>INTERNATIONAL CONFECTIONS COMPANY, LLC  an Ohio limited liability company, MAXFIELD CANDY COMPANY, a Utah corporation, DYNAMIC CONFECTIONS, INC., a Utah corporation, and DOLPHIN CAPITAL GROUP, L.L.C., a Delaware limited liability company,<br><br>Defendants. | **COMPLAINT**<br><br>Civil No. _____ |

4845-7258-5504.v1

Plaintiff Mrs. Fields Franchising, LLC ("MFF"), by its counsel, as and for its complaint against International Confections Company, LLC ("ICC"), Maxfield Candy Company ("Maxfield"), Dynamic Confections, Inc. ("Dynamic"), and Dolphin Capital Group, L.L.C. ("Dolphin") (collectively, the "Defendants") hereby alleges as follows:

## INTRODUCTION

1. This is an action for trademark infringement and breach of a licensing contract. Pursuant to a License Agreement dated May 16, 2013 (the "License Agreement"), MFF granted ICC a license to manufacture, sell and distribute certain products using the "Mrs. Fields" trademark. In exchange, ICC agreed to pay MFF royalties on all such sales, to provide certified reports attesting to the accuracy of ICC's sales and royalties and to provide other protections and control mechanisms for MFF and the "Mrs. Fields" brand. In September 2014, MFF terminated the License Agreement after ICC failed to comply with those obligations. Nevertheless, ICC continues to employ and market its products using the "Mrs. Fields" mark.

2. In addition, Dolphin, Dynamic and Maxfield, parties affiliated with ICC – but which were not granted any licensing rights – have been utilizing the mark in connection with their businesses. At the same time, those parties are claiming that defects in the termination notice to ICC prevent MFF from terminating the License Agreement. MFF believes their claims to be baseless.

3. By this action, MFF seeks to enjoin Defendants from the use of the "Mrs. Fields" mark, a declaration that the License Agreement has been terminated, damages arising from the infringement of MFF's mark, as well as attorneys' fees and costs.

## PARTIES

4. MFF is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 8001 Arista Place, Suite 600, Broomfield, Colorado 80021. MFF's member is a citizen of Delaware and Colorado.

5. ICC is a limited liability company organized under the laws of the State of Ohio with its principal place of business at 1050 S. 200 W., Salt Lake City, UT 84101. According to the List of Registered Principals on file with the Utah Secretary of State, ICC's sole member resides in Ohio.

6. Maxfield is a corporation incorporated in the State of Utah with its principal place of business at 1050 S. 200 W., Salt Lake City, UT 84101.

7. Dynamic is a corporation incorporated in the State of Utah with its principal place of business at 1050 S. 200 W., Salt Lake City, UT 84101.

8. Dolphin is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 136 Heber Avenue, Suite 101, Park City, UT 84060. On information and belief, Dolphin's members and/or partners reside in and are citizens of Utah. According to the business database of the Utah Secretary of State, Dolphin's status is listed as expired as of June 17, 2014 because of a failure to file a renewal.

## JURISDICTION AND VENUE

9. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the Plaintiff is asserting claims under the Lanham Act, 15 U.S.C. § 1051 *et seq*. This Court has supplemental jurisdiction over Plaintiff's additional claims pursuant to 28 U.S.C. § 1367.

10. In addition, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs, and is between citizens of different States.

11. The Court has personal jurisdiction over ICC since it has consented to *in personam* jurisdiction pursuant to Section 23(*l*) of the License Agreement, which provides that: "any legal action, suit or proceeding arising out of or in any way in connection with this Agreement may be instituted or brought in the United States District Court for the District of Utah. ICC and MFF hereby irrevocably consent and submit to, for themselves and in respect of their property, generally and unconditionally, the jurisdiction of such Court, and to all proceedings in such Court." In addition, the Court has *in personam* jurisdiction over ICC pursuant to Utah's Nonresident Jurisdiction Act, Utah Code § 78B-3-201 *et seq.* because ICC transacts business within this state. By conducting substantial and continuous activity in the State of Utah, ICC has engaged in sufficient contacts involving the State to make the exercise of specific and general personal jurisdiction foreseeable and fair in this Court.

12. The Court has *in personam* jurisdiction over Maxfield, Dynamic, and Dolphin pursuant to Utah's Nonresident Jurisdiction Act, Utah Code § 78B-3-201 *et seq.* because Maxfield, Dynamic, and Dolphin transact business within this state. By conducting substantial and continuous activity in the State of Utah, Maxfield, Dynamic, and Dolphin have engaged in sufficient contacts involving the State to make the exercise of specific and general personal jurisdiction foreseeable and fair in this Court.

13. Venue is proper in this District pursuant to Section 23(*l*) of the License Agreement, which – as noted above – provides that the parties may bring any action before this Court and consent to the Court's jurisdiction. Additionally, venue is proper in this Court under

4

28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims herein occurred in this District and/or 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over the Defendants.

## FACTUAL ALLEGATIONS

### A. Mrs. Fields

14. Mrs. Fields was founded in 1977 and is one of the most recognizable cookie brands in the world. MFF owns the rights to the "Mrs. Fields" trademark (including Reg. Nos. 1,299,149 and 1,456,702) and licenses those rights to allow other parties to manufacture, sell, and distribute products using the "Mrs. Fields" trademark.

### B. The Relationship between the Defendants and Their Use of the "Mrs. Fields" Mark

15. Dolphin is a private equity firm which manages Dynamic as one of its portfolio companies. According to its website, "Dolphin takes a hands-on approach to investing through a strategy we call 'Business Engineering.' [Dolphin] strive[s] to actively support our portfolio companies and we take an active role in the businesses when necessary."

16. Dolphin's website displays the "Mrs. Fields" mark in connection with the page devoted to a description of its portfolio company Dynamic. The website claims that Dynamic "is a manufacturer, wholesaler and retailer of chocolate and confectionary products which currently operates four subsidiaries," including Maxfield.

17. The same page displays the "Mrs. Fields" trademark as an example of the brands sold by Dynamic's subsidiaries.

18. The hyperlink to "Maxfield Candy" on the webpage links to the main Maxfield Candy homepage, which also displays the "Mrs. Fields" mark.

5

19.     According to the List of Registered Principals on file as of November 20, 2014 with the Utah Secretary of State, the President of Maxfield is D. Richard "Rick" Harris and the directors of Maxfield include three partners of Dolphin, Eric Jacobsen, Kenneth Jacquin and Daniel Schley.  Maxfield's registered agent is Daniel Schley, a co-founder of Dolphin.

20.     Maxfield claims that it completely sold its chocolate and confections business to ICC, including its name "Maxfield Candy Company," and that Maxfield has no direct or indirect control over ICC.

21.     Dolphin, Dynamic and Maxfield (to the extent that Maxfield is in fact a separate corporation from ICC) have no license to affiliate themselves with the "Mrs. Fields" mark or to display the mark on their web pages.

   **C.  The License Agreement**

22.     Prior to May 2013, MFF had licensed the "Mrs. Fields" mark to Maxfield, permitting Maxfield the right to manufacture and sell chocolates and confections through retail channels in the United States, Canada and Mexico.

23.     On May 16, 2013, MFF and ICC entered into the License Agreement granting ICC a license to manufacture, market, and/or sell chocolates and confections (the "Royalty Bearing Products") under the "Mrs. Fields" mark through retail channels in the United States, Mexico, and Canada.  In connection with the License Agreement, MFF and Maxfield executed a Termination Agreement with Release which terminated Maxfield's previous license.  The Termination Agreement with Release was signed by Rick Harris, Maxfield's long-time President.

24. Under the License Agreement, ICC was required – among other things – to:

   a. By the last day of the month following the last month of each calendar quarter, provide MFF with "a written statement prepared, signed, and certified to be true and correct by ICC's chief financial officer or its designee, setting forth ICC's Gross Sales, Net Sales, Units Sold, and Royalty amount for such period, including sufficient documentation and detail to confirm such statement." (License Agreement § 9(c));

   b. Remit to MFF a specified royalty percentage based upon the sales reported by ICC for each quarter (License Agreement § 5(a));

   c. Pay interest on any unpaid royalties owed to MFF but not paid by ICC (License Agreement § 5(c));

   d. Maintain minimum Net Sales pursuant to a specified schedule (License Agreement § 6(a)) and pay minimum royalties based on such minimum Net Sales (License Agreement § 6(b));

   e. Within 90 days of the end of each calendar year, provide MFF with "a written statement setting forth ICC's Gross Sales, Net Sales, Units Sold, and Royalty amount for such period, including sufficient documentation and detail to confirm such statement, used to determine such amounts, which calculations shall be signed and certified to be true and correct by an independent certified public accounting firm chosen by ICC and acceptable to MFF" (License Agreement § 9(b));

   f. Obtain and keep in force product liability insurance for MFF's benefit with at least a $5 million combined single limit for bodily injuries and/or property damage. (License Agreement § 15). In addition, ICC was required to submit a certificate of insurance naming MFF as an additional insured and providing that cancellation or reduction in coverage to MFF would only be effective upon 30 days prior notice to MFF (*id.*). The insurance requirements were specifically "acknowledged by ICC to be a material term of [the License] Agreement" (*id.*);

   g. Deliver to MFF samples of the Royalty Bearing Products upon request (License Agreement § 12(b)); and

   h. Deliver to MFF a forecast and other sales analysis upon request (License Agreement §§ 9(b)).

25.     The License Agreement provides that MFF has "the right in a proper case to obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction."  (License Agreement § 23(h)).

26.     Further, pursuant to the License Agreement, ICC recognized MFF's substantial and valid interests in its mark:

   a. "ICC agrees that it will not, during the term of this [License] Agreement or thereafter, attack the title or any rights of MFF in and to the Licensed Names and Marks. . . ." (License Agreement § 13(c));

   b. "ICC recognizes the value of the goodwill associated with the Licensed Names and Marks and acknowledges that the Licensed Names and Marks and all rights therein and goodwill pertaining thereto belong exclusively to MFF." (License Agreement § 13(b)); and

   c. "ICC further acknowledges the good will associated with the Protected Information, Licensed Names and Marks and that such Licensed Names and Marks have acquired secondary meaning in the mind of the public." (License Agreement § 20(a)).

27.     In addition, the License Agreement grants MFF, if it is the prevailing party, its costs as well as its reasonable attorneys' and accounting fees if "MFF . . . is required to enforce this Agreement in any judicial proceeding. . . ."  (License Agreement § 23(j)).

28.     The License Agreement further provides that, except to the extent it is governed by the Lanham Act or other federal law, Utah law governs.  (License Agreement § 23(k)).

**D.  Defaults Under the License Agreement and MFF's Termination**

29.     On August 26, 2014, MFF mailed ICC a Notice of Default stating that ICC had failed to comply with its obligations under the License Agreement to:

   a. Remit to MFF the Running Royalties for the calendar quarter ending June 30, 2014;

   b. Pay to MFF interest on the accrued and unpaid Running Royalties that were due on or before July 31, 2014;

  c. Deliver to MFF a certificate for product liability insurance with at least a $5 million combined single limit for bodily injuries and/or property damage naming MFF as an additional insured;

  d. Provide MFF with written annual financial statements signed and certified to be true and correct by an independent certified public accounting firm acceptable to MFF;

  e. Provide MFF with quarterly financial statements signed and certified to be true by ICC's chief financial officer or its designee;

  f. Deliver to MFF samples of the Royalty Bearing Products upon request; and

  g. Deliver to MFF a forecast and other sales analysis upon request.

30. Under the License Agreement, ICC had 20 days (or until September 15, 2014) to cure "defaults in the payment of any Running Royalties" (License Agreement § 17(b)(i)) and 30 days (or until September 25, 2014) to cure its failure to "perform any [other] material term or condition," unless (a) "such remedy cannot be accomplished within such time period," (b) ICC had commenced diligent efforts within the 30 day period, and (c) ICC was continuing such efforts until the remedy is complete. (*Id.* § 17(b)(ii)).

31. ICC failed to provide written royalty statements for each quarter, prepared, signed, and certified by ICC's chief financial officer to be true and correct, along with supporting documentation. Instead, at 9:46 p.m. on September 25, 2014 (the very last day to cure), ICC emailed MFF Excel spreadsheets purporting to show quarterly financial summaries for four of the five missing quarters. For one quarter, ICC reported zero sales and for two other quarters, ICC reported abnormally low sales. Instead of written statements signed and certified to be true and correct, ICC merely included a line at the bottom of each spreadsheet stating "Approved by Rick Harris, President, International Confections Company, LLC." None of the quarterly

spreadsheets were accompanied by any supporting documentation, let alone documentation sufficient to confirm the statements. Although ICC reported allowances of $179,101, ICC provided no documentation supporting the deductions as required by the License Agreement.

32. ICC also failed to provide the 2013 annual royalty report signed and certified by an independent certified public accounting firm, together with the required supporting documentation. Pursuant to the License Agreement, the annual certified report was supposed to reveal whether the Running Royalties paid during any quarter were less than the amount required to be paid and ICC was to then immediately pay such amounts, together with accrued interest, to MFF. (License Agreement §9(b)). Without the report, MFF was (and remains) unable to determine whether additional royalties were owing.

33. ICC also failed to provide a certificate for product liability insurance with at least a $5 million combined single limit for bodily injuries and/or property damage naming MFF as an additional insured. This certificate was "acknowledged by ICC to be "a material term of [the License] Agreement." (License Agreement § 15). Instead, ICC provided a certificate of liability insurance dated as of August 25, 2014 – and not within 30 days of May 16, 2013 as required by the License Agreement – naming "Mrs. Fields Cookies" as an additional insured under the general liability policy issued to ICC and Maxfield. The certificate indicated that the general liability policy had a per-occurrence limit of $1 million as well as a personal injury limit of $1 million. The certificate gave no indication whether the insurance covered bodily injury and/ or property damage arising from product liability claims. In addition, the certificate failed to indicate that "any cancellation or material change or alteration which reduces coverage or any benefits accruing to MFF shall become effective only upon thirty (30) days prior notice to MFF." (License Agreement § 15).

34. ICC also failed to provide representative samples of all Royalty Bearing Products being sold, together with any packaging inserts, labeling, wrapping, advertising, marketing, and promotional materials.

35. ICC also failed to provide a forecast and other sales analysis of the Royalty Bearing Products.

36. In addition to the failures in paragraphs 29 to 35, ICC failed to provide any showing that such failures could not be remedied in the 30 day cure period, that ICC had commenced diligent efforts to cure such failures in the 30 day cure period, or that ICC was continuing such diligent efforts.

37. On September 26, 2014, MFF terminated the License Agreement pursuant to Section 17(b)(ii) via a Notice of Termination listing ICC's failures to cure its defaults. Pursuant to the License Agreement, the Notice of Termination demanded: (i) the payment of any and all amounts due and owing; (ii) the return of all Protected Information, confidential documents, and other material supplied by MFF to ICC; (iii) a statement identifying any rights, equities, good will, titles or other rights in and to the Royalty Bearing Product recipes, Licensed Names, and Marks which may have been obtained by ICC or which may have vested in ICC in pursuance of any endeavors covered by the Agreement; (iv) a statement identifying any packaging designs for the Royalty Bearing Products; and (v) a statement indicating the number and description of any Royalty Bearing Products in ICC's inventory which have been packaged in packages bearing the Licensed Names and Marks. Those demands were repeated in correspondence dated October 2, 2014 and November 5, 2014.

### E. Defendants' Attempts to Evade the Termination

38. After receiving the Notice of Termination, by letter dated September 26, 2014, ICC disputed MFF's termination primarily on the grounds that its period to cure its defaults under the License Agreement had not yet expired. Specifically, ICC asserted that:

   a. ICC could not provide a complying certificate of insurance within 30 days;

   b. ICC could not provide complying, certified quarterly statements within 30 days;

   c. ICC could not provide a complying, certified annual report within 30 days; and

   d. ICC could not provide samples and packaging/marketing materials within 30 days.

In addition, ICC quoted the language of the License Agreement (§ 17(b)(ii)) regarding "diligent efforts" to remedy its defaults and concluded, without more, that ICC was "continuing to effect a cure in strict compliance with the requirements of the License Agreement."

39. Notwithstanding the Notice of Termination, ICC continued to use the "Mrs. Fields" mark in connection with its business.

40. MFF repeatedly demanded, including by emails dated October 15 and 24, 2014, that ICC cease and desist from all uses of MFF's licensed marks and recipes and that such use was materially harming MFF.

41. By letter dated October 31, 2014, the law firm of Hemenway & Barnes LLP, purportedly on behalf of Maxfield, claimed that the Notice of Termination was invalid because MFF failed to give Maxfield notice of ICC's defaults and an opportunity to cure ICC's defaults within 30 days as purportedly required by a Consent to Collateral Assignment (the "Maxfield Letter").

42. On or about June 26, 2013, MFF, ICC and Maxfield had entered into a Consent to Collateral Assignment, whereby MFF consented to a purported transaction whereby ICC granted a security interest to Maxfield of ICC's rights under the License Agreement. As recited in the Consent to Collateral Assignment, the security interest was granted in connection with a loan extended by Maxfield to ICC. Curiously, the Consent to Collateral Assignment was not signed by an officer, director or employee of Maxfield. Instead, it was signed by Kenneth Pacquin as a director of Dynamic.

43. Despite its claim to the contrary, Maxfield had full and actual notice of the Notice of Default and the Notice of Termination on or about the time they were sent. In fact, immediately after the Notice of Default was sent, the President of Maxfield – Rick Harris – communicated with MFF regarding the Notice of Default.

44. In addition, Maxfield asserts that it has no direct or indirect control over ICC and therefore has no ability to cure any of the defaults.

45. In addition, more than 30 days have passed since the Maxfield Letter and neither Maxfield nor ICC has taken any steps to cure the defaults.

46. Despite claims to the contrary, from the public statements and public filings it appears that Maxfield and ICC are in fact the same company. There are also questions whether any loan amounts remain outstanding sufficient to grant Maxfield enforceable "collateral" rights in the License Agreement, whether the Consent to Collateral Assignment was illusory, whether the Consent to Collateral Assignment lacked consideration and whether the signature of a director of Dynamic is sufficient to execute the Consent to Collateral Assignment on behalf of Maxfield.

47. To date, ICC, Maxfield, Dynamic and Dolphin continue to use and employ the "Mrs. Fields" mark.

## COUNT I

### Violation of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*
### (Against All Defendants)

48. MFF restates and incorporates each of the foregoing paragraphs as if fully set forth herein.

49. MFF has valid, legally protected, and registered marks for the "Mrs. Fields" brand.

50. MFF is the sole owner of the "Mrs. Fields" mark.

51. ICC has continued to use the "Mrs. Fields" mark in connection with its business, including marketing, manufacturing, and selling goods under the "Mrs. Fields" brand, even after the termination of the License Agreement.

52. Dolphin, Dynamic, and Maxfield have utilized the "Mrs. Fields" mark in connection with their attempts to market their businesses.

53. Defendants' uses of the "Mrs. Fields" mark is harmful to MFF's trademark rights and is likely to cause consumers to believe that their products and companies are affiliated with the "Mrs. Fields" brand.

54. As a result of ICC's violations of the Lanham Act, MFF is entitled to preliminary and permanent injunctions enjoining the Defendants from all uses of the "Mrs. Fields" mark, damages in an amount to be determined at trial, including all profits ICC has derived from the unauthorized use of the mark along with statutory and contractual attorneys' fees and costs, treble damages for the manufacture and sale of any counterfeit goods, and statutory damages.

## COUNT II

### Common Law Trademark Infringement
### (Against All Defendants)

55. MFF restates and incorporates each of the foregoing paragraphs as if fully set forth herein.

56. MFF has valid, legally protected, and registered marks for the "Mrs. Fields" brand.

57. MFF is the sole owner of the "Mrs. Fields" mark.

58. MFF uses the "Mrs. Fields" mark extensively and continuously nationwide.

59. ICC has continued to use the "Mrs. Fields" mark in connection with its business, including marketing, manufacturing, and selling goods under the Mrs. Fields brand, even after the termination of the License Agreement.

60. Dolphin, Dynamic, and Maxfield have utilized the "Mrs. Fields" mark in connection with their attempts to market their businesses.

61. Defendants' uses of the "Mrs. Fields" mark is harmful to MFF's trademark rights and is likely to cause consumers to believe that their products and companies are affiliated with the "Mrs. Fields" brand.

62. As a result of Defendants common law trademark infringement, MFF is entitled to preliminary and permanent injunctions enjoining the Defendants from all uses of the "Mrs. Fields" mark as well as damages in an amount to be determined at trial.

4845-7258-5504.v1

## COUNT II

### Declaratory Judgment
### (Against ICC and Maxfield)

63. MFF restates and incorporates each of the foregoing paragraphs as if fully set forth herein.

64. ICC defaulted under the License Agreement by, among other things, failing to provide MFF with: (i) all of the Running Royalties as well as interest on accrued on unpaid Running Royalties; (ii) a certificate of product liability insurance with at least a $5 million combined single limit for bodily injuries and/or property damage naming MFF as an additional insured; (iii) annual financial statements signed and certified to be true and correct by an independent certified public accounting firm acceptable to MFF; (iv) quarterly financial statements signed and certified to be true and correct by ICC's chief financial officer or its designee; (v) samples of the Royalty Bearing Products; and (v) a forecast and other sales analysis.

65. MFF properly provided notice and an opportunity cure the defaults to ICC under the License Agreement and, to the extent necessary, to Maxfield.

66. MFF properly terminated the License Agreement.

67. As a result, MFF is entitled to a declaratory judgment that the License Agreement has been properly terminated and is no longer in effect, plus contractual attorneys' fees and costs, as well as preliminary and permanent injunctions enjoining ICC and Maxfield from all uses of the "Mrs. Fields" mark.

## COUNT III

### Breach of Contract
### (Against ICC)

68. MFF restates and incorporates each of the foregoing paragraphs as if fully set forth herein.

69. MFF and ICC are parties to a valid, enforceable, and binding contract – the License Agreement.

70. ICC has breached the terms of the License Agreement by, among other things, failing to provide certified quarterly royalty reports with supporting documentation, to provide annual royalty reports certified by an independent certified public accounting firm, to procure sufficient product liability insurance covering the term of the License Agreement, and to provide samples of the Royalty Bearing Products and forecasts and sales analyses.

71. ICC's breaches have rendered MFF incapable of determining the true amount of Running Royalties and interest thereon due and owing as provided for in the License Agreement. The reasonable inference from ICC's failure to supply certified royalty information, with supporting documentation, is that ICC owes MFF additional amounts.

72. While MFF is incapable of computing such amounts without certified and audited royalty information, plus the required supporting documentation, MFF believes that such amounts are likely in excess of $75,000.

73. As a result of ICC's breach of contract, MFF is entitled to preliminary and permanent injunctions enjoining ICC and Maxfield from all uses of the "Mrs. Fields" mark, damages in an amount to be determined at trial stemming from any shortage in the royalties reported and paid by ICC, plus contractually mandated interest thereon, plus damages in an

amount to be determined at trial stemming from harm to MFF's trademark as a result of ICC's continued use of the trademark post-termination, plus interest thereon, contractual attorneys fees and costs.

## COUNT IV

### Unjust Enrichment
### (Against all Defendants)

74. MFF restates and incorporates each of the foregoing paragraphs as if fully set forth herein.

75. The Defendants have benefitted themselves through the use of MFF's "Mrs. Fields" mark.

76. Dolphin, Dynamic and Maxfield have not obtained MFF's consent to their use of the "Mrs. Fields" mark or provided compensation to MFF for such use.

77. ICC has not obtained MFF's consent to its post-termination use of the "Mrs. Fields" mark or provided compensation to MFF for such use.

78. As a result of the Defendants' improper use of the Mrs. Fields mark, Plaintiff has suffered damages in an amount to be determined at trial, plus interest thereon.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for judgment against the Defendants as follows:

1. For an injunction prohibiting the Defendants and all persons acting in concert with them from any further use of the "Mrs. Fields" mark;

2. For an award of damages to be determined at trial;

3. For an award of attorneys' fees and costs;

4. For a declaration that the License Agreement has been properly terminated and is no longer in effect; and

5. For such other and further relief as to this Court seems just and equitable.

DATED this 2nd day of December, 2014.

                                      KIRTON MCCONKIE PC

                                      By: /s/ Rod N. Andreason
                                              Rod Andreason

                                      STORCH, AMINI & MUNVES PC
                                          Bijan Amini
                                          Avery Samet

                                      *Attorneys for Plaintiff Mrs. Fields'*
                                      *Franchising, LLC*

Plaintiff's Address:

8001 Arista Place, Suite 600
Broomfield, Colorado 80021

4845-7258-5504.v1